Goriune Dudukgian, AK Bar No. 0506051
Nicholas Feronti, AK Bar No. 2106069
Aneliese Palmer, AK Bar No. 2201001
**NORTHERN JUSTICE PROJECT, LLC**
406 G Street, Suite 207
Anchorage, AK 99501
Tel: (907) 308-3395
Fax: (866) 813-8645
Email: gdudukgian@njp-law.com
Email: nferonti@njp-law.com
Email: apalmer@njp-law.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| L. SHANE LAND and CHRISTI ANGELO, individually and as the parents of T.L., a minor child, on behalf of themselves all those similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>MATANUSKA-SUSITNA BOROUGH SCHOOL DISTRICT, DAVID RUSSELL, ANGELA SNOW, and LAURA KELLY,<br><br>    Defendants. | Case No._____<br><br><br><br><br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

COME NOW the plaintiffs, L. Shane Land and Christi Angelo, individually and

as the parents of plaintiff T.L.,[1] on behalf of themselves and all those similarly situated,

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a)(3), this minor child is identified by his initials to protect his privacy.

1

alleging and requesting relief as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiffs bring this action to end the Matanuska-Susitna Borough School District's (hereinafter "MSBSD" or "the District") practice of using excessive and unjustified restraint and seclusion on disabled students. The District treats its vulnerable students like incarcerated criminals by using these demeaning and ineffectual practices to silence, detain, isolate, control, and punish students who have behavioral challenges as a manifestation of their disabilities.

2.    Educators widely recognize that restraint and seclusion are dangerous, traumatizing, ineffective, counterproductive, and should be used only in rare *emergency* situations. These techniques should not be used as a substitute for evidence-based behavioral interventions for students with emotional and behavioral needs. Yet, since 2015, there have been more than 1,800 documented incidents of restraints and seclusions in the District. The vast majority of these incidents involved students with one or more disabilities. And these are just the *documented* incidents. Plaintiffs allege upon information and belief that the actual number of restraints and seclusions is much higher.

3.    MSBSD uses restraint and seclusion as a routine response to address noncompliant student behavior, even in the absence of any safety threat or when less restrictive methods would have been successful in preventing or mitigating the safety threat. MSBSD uses these techniques as punishment and/or to achieve behavioral compliance, instead of using positive behavioral interventions and supports, de-escalation techniques, and otherwise accommodating students with disabilities.

2

4. MSBSD repeatedly uses restraint and seclusion on students without determining if current interventions and supports are being implemented properly, and without determining whether additional or different interventions or supports may be needed.

5. By relying on restraint and seclusion as a behavior management tool in lieu of positive behavioral interventions that are proven to be more effective at deescalating behaviors, MSBSD has repeatedly violated state and federal law and its own guidelines on the use of these techniques. In doing so, the District has systematically discriminated against students with disabilities.

6. As a result of the District's excessive and illegal use of restraint and seclusion, Plaintiff T.L. and a class of similarly situated students have suffered significant injuries and trauma, have been segregated from their peers, have missed significant instructional time, and have been denied equal and meaningful access to the District's programs and services.

7. MSBSD has also failed to document and report its use of restraint and seclusion in accordance with state law. Thus, the District has misled parents about the mistreatment of their children at school and has misrepresented the frequency of its use of restraint and seclusion in its required annual reports to the Alaska Department of Education and Early Development ("DEED").

8. MSBSD is the second-largest school district in Alaska. In February 2023, Alaska's largest school district – the Anchorage School District ("ASD") – agreed to a settlement with the United States Justice Department, whereby it agreed to completely

3

eliminate the use of seclusion at all district schools at the beginning of the 2023–2024 school year. ASD also agreed to ensure that students are restrained only when their behavior poses an imminent danger of serious physical harm to the student or another person; to properly document and report all restraints; to create classroom management plans for specialized programs serving students with disabilities that will promote and reinforce positive behaviors and guide staff in employing appropriate de-escalation techniques; and to appoint an administrator to monitor the district's restraint practices. Plaintiffs bring this action to obtain similar relief for the students and parents of MSBSD.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because they arise from a common nucleus of operative facts.

10.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Alaska because the events or omissions giving rise to this complaint wholly or substantially occurred within the district.

## PARTIES

11.    Plaintiff T.L. is a minor child whose date of birth is March 21, 2016. T.L. is a citizen of the United States and a resident of the State of Alaska. T.L. resides in Wasilla, Alaska, within the boundaries of MSBSD. During all relevant times, T.L. was a "qualified individual with a disability" within the meaning of the Americans with

4

Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). T.L. brings this action through his parents, Shane Land and Christi Land.

12. Plaintiff L. Shane Land is a natural person who is a United States citizen and a resident of the State of Alaska. Mr. Land is T.L.'s father.

13. Plaintiff Christi Angelo is a natural person who is a United States citizen and a resident of the State of Alaska. Ms. Angelo is T.L.'s mother.

14. Mr. Land and Ms. Angelo are collectively referred to as "Parents" in this Complaint.

15. Defendant Matanuska-Susitna Borough School District is a borough school district organized and operating under the laws of Alaska. *See* AS 14.12.010(2). It operates 49 schools and provides educational services for more than 19,000 students within the Matanuska-Susitna Borough. MSBSD receives financial assistance from the federal government.

16. Defendant David Russell is employed by MSBSD as the principal of Shaw Elementary School in Wasilla. Defendant Russell is sued in his official capacity for purposes of injunctive relief and in his individual capacity for damages.

17. Defendant Angela Snow is employed by MSBSD as a "tutor advisor" at Shaw Elementary. Defendant Snow is sued in her official capacity for purposes of injunctive relief and in her individual capacity for damages.

18. Defendant Laura Kelly was employed by MSBSD as a paraprofessional at Shaw Elementary School during the 2022–2023 school year. Defendant Kelly is sued in her individual capacity.

19.    Defendants Russell, Snow, and Kelly are collectively referred to as "the Individual Defendants" in this complaint.

## GENERAL ALLEGATIONS

**Alaska Law on the Restraint and Seclusion of Students**

20.    Alaska law prohibits the "restraint" and "seclusion" of public school students except in rare emergency situations. *See* AS 14.33.125. A "restraint" is defined as the use of a psychopharmacological drug, device, or physical force to immobilize a student or reduce a student's ability to move their arms, legs, or head freely. AS 14.33.125(g)(1)–(4). A "seclusion" is the involuntary confinement of a student alone in a room or area from which the student is physically prevented from leaving. AS 14.33.125(g)(5).

21.    Under AS 14.33.125(b), school personnel may only restrain or seclude a student if *all* of the following conditions are satisfied: (1) the student's behavior poses an imminent danger of physical injury to the student or another person; (2) less restrictive interventions would be ineffective to stop the imminent danger; (3) an adult staff member continuously monitors the student in face-to-face contact or, if face-to-face contact is unsafe, by continuous direct visual contact with the student; (4) the staff member(s) applying the restraint or seclusion have received training in crisis intervention, de-escalation, and restraint techniques from a program that has been approved by DEED, unless a trained person is not immediately available and the circumstances present an unavoidable and unforeseen emergency; and (5) the restraint or seclusion is discontinued

immediately when the student no longer poses an imminent danger of physical injury to anyone or when a less restrictive intervention would be effective to stop the danger of physical injury.

22.     Under AS 14.33.125(c)(3), school personnel may not "physically restrain a student by placing the student on the student's back or stomach or in a manner that restricts the student's breathing."

23.     Due to the risks inherent in placing a child in a physical restraint or in an isolation room, which are described further below, schools are required to document *each* time such an intervention is used. Under AS 14.33.125(d), school personnel who restrain or seclude a student must provide a written report of the incident to the student's parents and/or legal guardians. The report must include the date and time of the incident; the names and job titles of school personnel who participated in or supervised the incident; a description of the activity that preceded the incident, including efforts and strategies used with the student before the incident; a description of the incident, including the type and duration of the intervention used; and a description of how the incident ended, including any further action taken. This report must be given "on the same day as the incident." AS 14.33.120(b).

24.     Under AS 14.33.125(e), school districts must establish a review process and must conduct a review for each incident that involves the restraint or seclusion of a student. The review must be conducted as soon as practicable after the event and include staff review of the incident; follow-up communication with the student and the student's parent or legal guardian; and a review of and recommendations for adjusting or amending

7

procedures, strategies, accommodations, individualized education plans, or other student behavior plans, or for additional staff training.

25.    According to Representative Charisse Millett's Sponsor Statement for the bill that was eventually codified in AS 14.33.125, the purpose of the statute was to "protect students from trauma, keep parents informed of what happens to their child, and support teachers and school personnel tasked with incredibly difficult decisions." *Sponsor Statement for House Bill 210*, available at https://www.akleg.gov/basis/get_documents.asp?session=28&docid=23708. At a February 12, 2014 hearing of the House Education Standing Committee, a staffer for Representative Millet explained that "the requirement for timely notice to the parent was the impetus for bringing this bill forward." At a subsequent hearing of the House Finance Committee on March 25, 2014, Representative Millet herself explained that parental notification was essential to ensure that restraint and seclusion were not being "overused or misused." Representative Millet further explained that parent notification "alert[s] the parents and allow[s] them to prepare for the resulting consequences in the child's behavior. If a parent had an autistic child and was not notified that a child had been restrained they could have no idea why a child's behavior had changed drastically from earlier in the day."

**MSBSD's Policies on Restraint and Seclusion**

26.    The governing Board of MSBSD has adopted a Board Policy and an Administrative Regulation on the use of restraint and seclusion on the District's students.

27.    Board Policy 5142.03 states that "[t]he Board believes that a safe

8

educational environment is necessary for learning and understands there are times when student behavior may impact the safety of that student or others. To the maximum extent appropriate, the safety and welfare of students and staff should be secured through positive behavioral interventions. The use of physical restraint and seclusion is prohibited except in emergency situations . . . ."

28.     Under Board Policy 5142.03, chemical or mechanical restraint of students is never allowed. Furthermore, physical restraint is prohibited "unless the student's behavior poses an imminent danger of physical injury to the student or others and less restrictive interventions would be ineffective at stopping the imminent danger. To the extent possible without compromising safety, other interventions should be attempted prior to the use of restraint. Restraint must be limited to that necessary to address the emergency and must be immediately discontinued when the student no longer poses an imminent danger or when a less restrictive intervention is effective to stop the danger."

29.     Under Board Policy 5142.03, physical restraint "may not be used as a form of discipline, to force compliance, as a convenience for staff, or as a substitute for appropriate educational support."

30.     Under Board Policy 5142.03, physical restraint "must be implemented in a manner that protects the health and safety of the student and others. Restraint may be administered only by staff trained in crisis intervention, de-escalation, and safe restraint, unless a trained person is not immediately available and the circumstances are rare and present an unavoidable and unforeseen emergency. Restraint may not prevent or restrict the student from breathing or speaking nor may it restrict circulation. Prone or supine

restraint, which occurs when the student is placed on his or her stomach or back, is expressly prohibited. A student's well-being must be monitored during restraint through the use of continuous face-to-face contact or, if face-to-face contact is unsafe, by continuous direct visual supervision."

31.     Board Policy 5142.03 also regulates the use of seclusion by district personnel. Under this policy, a seclusion "should last only as long as necessary to resolve the actual risk of imminent danger or when a less restrictive intervention is effective to stop the danger. Seclusion should never be used as a form of discipline, to force compliance, or as a substitute for appropriate educational support." Furthermore, a seclusion "must be sensitive to any particular vulnerabilities of the student and to the student's developmental level."

32.     Board Policy 5142.03 requires the District's staff to review each incident of restraint and seclusion "[a]s soon as practicable" after the incident. This review must include "review of and recommendations for adjusting or amending, as applicable, procedures, strategies, accommodations, the [Individualized Education Program ("IEP")], a student behavior plan, or additional staff training. Follow-up communication shall occur with the student and parent/legal guardian regarding the review process and outcomes."

33.     For students who are disabled and have an IEP, Board Policy 5142.03 allows the use of restraint and seclusion only if "determined appropriate by the IEP team after considering all less restrictive alternatives."

34.     Board Policy 5142.03 requires the District to document *each* incident of

restraint and seclusion. "A written report must be prepared by school personnel who restrain or seclude a student and provided to the school administrator. The report must include: the date and time of the incident; names and job titles of the school personnel who participated or supervised; a description of the conduct that preceded the incident, including efforts and strategies utilized prior to restraint or seclusion; a description of the restraint or seclusion, including duration; and a description of how the incident ended, including any further action taken." A copy of this report must be provided to the student's parents/legal guardians *on the same day* of the incident.

35.     Administrative Regulation 5142.03 states that the "David Mandt and Associates" training program (hereinafter "the Mandt System") "will be used for training staff members in use of evidence based techniques related to positive behavior supports, conflict prevention and management techniques, skills to de-escalate student behavior, understanding antecedents; the safe use of restraint or seclusion in emergency situations; and applicable policies and procedures."

36.     The Mandt System is an evidence-based training program for managing challenging behavior, de-escalation, and crisis prevention techniques. The Mandt System teaches certain restraints that can be safely applied, but only as a last resort when preventative efforts and de-escalation have proven ineffective to stop the dangerous behavior. At the same time, certain types of restraints that can cause injury and impede breathing or communication – such as take-down maneuvers, floor restraints, and hyper-extension of joints – are prohibited under the Mandt System.

**MSBSD's Use of Restraint and Seclusion on Disabled Students**

37.      Despite its own policies and the requirements of state law, MSBSD has allowed its staff to engage in a pattern and practice of restraining and secluding students with disabilities as a routine response to maladaptive behaviors, without first exhausting the use of less restrictive measures and accommodations. MSBSD has also condoned the use of restraint and seclusion when a student's behavior poses no imminent danger to anyone. MSBSD uses restraint and seclusion as a common disciplinary method for students with disabilities, rather than limiting those techniques to *rare* emergency situations where no safe alternative exists.

38.      From the start of the 2015–2016 school year through the end of the 2022–2023 school year, there were 1,804 documented incidents involving the restraint or seclusion of a student in the District. The vast majority of these incidents involved students with disabilities.

39.      During the 2021–2022 school year, MSBSD reported 235 incidents of restraint and seclusion. Of these, 31 involved a student with a cognitive/intellectual disability, 72 involved a student with an emotional disturbance, 56 involved a student with early childhood developmental delay, eight involved a student with autism, 38 involved a student with an "other health impairment," and 25 involved a student with multiple disabilities. Thus, approximately 98 percent of the incidents of restraint and seclusion by District personnel during the 2021–2022 school year involved students with disabilities.

40.      For context, during the same 2021–2022 school year, the Los Angeles

Unified School District, which serves more than 550,000 students, reported only 119 restraints and zero seclusions in schools operated by the district.

41. During the 2022–2023 school year, MSBSD reported 208 incidents of restraint and seclusion. Of these, 72 involved a student with a cognitive/intellectual disability, 41 involved a student with an emotional disturbance, 63 involved a student with early childhood developmental delay, eight involved a student with autism, and 18 involved a student with an "other health impairment." Thus, approximately 97 percent of the incidents of restraint and seclusion by District personnel during the 2022–2023 school year involved students with disabilities.

42. Plaintiffs allege upon information and belief that MSBSD has significantly underreported the incidents of restraint and seclusion in the District. In a 2019 report, the U.S. Government Accountability Office ("GAO") found a "pervasive pattern of underreporting of restraint and seclusion in U.S. public schools." U.S. Gov't Accountability Off., *K-12 Education: Education Should Take Immediate Action to Address Inaccuracies in Federal Restraint and Seclusion Data* at 9 (June 18, 2019), available at: https://files.eric.ed.gov/fulltext/ED600152.pdf. Indeed, Parents have personally observed multiple incidents of restraint and/or seclusion of T.L. that were never reported by the District.

**Restraint and Seclusion Traumatizes Students**

43. The trauma inflicted upon children who are subjected to restraint and seclusions has been documented by the federal government and in numerous studies.

44. In a 2009 report, the GAO found that "these techniques can be dangerous

13

because they may involve physical struggling, pressure on the chest, or other interruptions in breathing." U.S. Gov't Accountability Off., *Seclusions and Restraints Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers* at 1 (May 19, 2009), available at: https://www.gao.gov/new.items/d09719t.pdf. "Even if no physical injury is sustained, . . . individuals can be severely traumatized during restraint." *Id.*

45. According to the U.S. Department of Education's Office for Civil Rights, "[a] school's use of restraint or seclusion may have a traumatic impact on a student, such that even if she were never again restrained or secluded, she might nevertheless have new academic or behavioral difficulties . . . . That traumatizing effect could manifest itself in new behaviors, impaired concentration or attention in class, or increased absences . . . ." U.S. Dep't of Ed. Off. for Civ. Rights, *Fact Sheet: Restraint and Seclusion of Students with Disabilities* at 1 (Dec. 28, 2016), available at: https://www2.ed.gov/about/offices/list/ocr/docs/dcl-factsheet-201612-504-restraint-seclusion-ps.pdf.

46. The Council for Children with Behavioral Disorders ("CCBD") has highlighted the psychological impacts that restraint and seclusion can have on children. The effects of restraints can "range from short-term such as fear and an adrenaline rush of physical confrontation to long-term effects such as Post Traumatic Stress Disorder." Council for Children with Behavioral Disorders, *CCBD's Position Summary on The Use of Physical Restraint Procedures in School Settings* at 5 (July 8, 2009), https://higherlogicdownload.s3.amazonaws.com/SPED/bc40048c-cf24-4380-a493-273ff305ca3c/UploadedImages/CCBD%20Position%20on%20Use%20of%20Restraint

%207-8-09.pdf. With regard to seclusions, CCBD states that "a wide variety of injuries and deaths have occurred while students are in seclusion environments including suicide, electrocution, and self injury due to cutting, pounding, and head banging." The Council for Children with Behavioral Disorders, *CCBD's Position Summary on The Use of Seclusion in School Settings* at 4 (July 8, 2009), https://higherlogicdownload.s3.amazonaws.com/SPED/bc40048c-cf24-4380-a493-273ff305ca3c/UploadedImages/CCBD%20Position%20on%20Use%20of%20Seclusion%207-8-09.pdf. Seclusions may also cause "continuing significant psychological damage." *Id.* at 5.

47.    Restraint and seclusion negatively impact a child's learning. This is because exposure to trauma decreases neural connectivity in the parts of the brain responsible for executive functioning, memory, logical and sequential thinking, and language development. Exposure to trauma also frequently induces maladaptive behaviors by causing deficits in emotional self-regulation.

48.    The reflexive use of restraint and seclusion to achieve behavioral control fails to teach students important adaptive behaviors, including how to communicate and interact with peers and staff in a positive way.

49.    Restraint and seclusion are not only harmful techniques, but they are also less effective than alternative evidence-based approaches – such as Multi-Tiered Systems of Support ("MTSS") and Positive Behavioral Interventions and Supports ("PBIS") – for addressing maladaptive behaviors. These safer and less traumatic interventions have been successfully implemented in numerous school districts across the country, eliminating

seclusion entirely and reducing physical restraint to an extremely rare occurrence. These non-physical interventions are linked to positive outcomes, such as greater academic achievement, fewer disciplinary problems, and fewer injuries to school staff.

**MSBSD's Seclusions and Restraints of T.L.**

50.     Plaintiff T.L. is currently seven years old. During the 2022–2023 school year, when the relevant events occurred, T.L. weighed approximately 50 pounds.

51.     At all relevant times, T.L. has been eligible to receive special education and related services from the District under the disability category of Early Childhood Developmentally Delayed.

52.     As a result of his disability, T.L. has challenges with social communication, expressive and receptive language, and sometimes engages in maladaptive behaviors at school, including non-compliance, aggression, and elopement.

53.     The District developed a Behavioral Intervention Plan ("BIP") for T.L. on March 25, 2022. The BIP stated that "the team will use reboot interventions for unsafe behaviors." The term "reboot interventions" is not defined in the BIP. However, Parents were given a handout that explains the "reboot process." The handout states that when a student makes "a bad choice in the classroom," the student will "reboot" by first going to a "cool off area," and then doing work folders or a "thinking sheet" at the "reboot desk," after which the student would talk with the teacher about "how to fix my problem," make any apologies, and only then return to the activity the student was engaged in before the reboot. The BIP stated that to "process out" of a reboot, T.L. "is calm first then chooses three physical activities from a visual menu (wall pushups, guided deep breaths, jumping

jacks) and then discusses what behavior was unsafe and what he can do next time."

54.     The BIP includes a "crisis plan" for when T.L. "escalates" and "becomes aggressive." The crisis plan states: "If [T.L.] becomes aggressive, staff will respond immediately by alerting the necessary staff . . . for support via verbal or radio. [T.L.] will be requested to take a safe break in the safe room. If he does not comply *staff will use MANDT techniques* to guide him to the safe space. Once there, a staff member will stay with him. [T.L.] will be reminded of safe options every 2 to 3 minutes. The office will be alerted as needed. A log will be kept." (emphasis added).

55.     T.L. was placed in the Structured Learning Program at Shaw Elementary at the start of the 2022–2023 school year. This program is designed for students who have significant social communication and behavioral needs and require instruction in a structured setting. It claims to integrate principles of applied behavior analysis ("ABA") and other evidence-based practices to develop skills related to social interaction, pragmatic language, perspective taking, organization, and emotional regulation.

56.     Shaw Elementary has a seclusion room, which is euphemistically called the "Zen Den." It is a cinder block walled room, with dimensions measuring 6'4"x 5'6 ½" x 8'9" (L x W x H). Students who are placed in the seclusion room are physically prevented from leaving by a metal door that is closed and cannot be opened from the inside. School personnel can only observe students in the seclusion room through a small slit window.

57.     Below is a photograph of the seclusion room at Shaw Elementary (although the stuffed animal on the floor is not typically in the room):



58.    Between August 30, 2022 and September 30, 2022, T.L. missed more than seven hours of instruction because he was placed in "reboot" for eight separate behavioral incidents. Plaintiffs allege upon information and belief that T.L. was placed in the seclusion room during some of these "reboot" incidents. Parents were not notified of these behavioral incidents until March 2023. The vast majority of incidents were described as either "not following directions," "refusal," or "disrespect," which are *not* grounds for a "reboot" under the operative BIP, and posed no imminent danger of physical injury to anyone.

59.    On September 13, 2022, T.L. was placed in solitary confinement in the seclusion room for 16 minutes as a result of allegedly engaging in aggressive behaviors with staff. Contrary to the requirements of AS 14.33.125(d), Parents did not receive a report of the September 13, 2022 seclusion until March 2023, nor did the District engage

in the review process required by AS 14.33.125(e). While the report of the incident states that "Team met to adjust/review deescalation strategies," Parents were excluded from this "team" discussion. No changes were made to T.L.'s IEP or BIP at this time, nor did the District perform a functional behavior assessment ("FBA") to gain a better understanding of the root causes of T.L.'s alleged behaviors.

60.     On October 14, 2022, T.L. was secluded again for 38 minutes in the "Zen Den" for allegedly engaging in aggressive behaviors with staff. Once again, Parents did not receive a report of this incident until March 2023, in violation of AS 14.33.125(d). Once again, the District did not communicate with Parents about adjusting T.L.'s IEP or BIP or performing additional assessments.

61     Between January 10, 2023 and March 2, 2023, T.L. missed more than 48 hours of instruction because he was placed in "reboot" for 24 separate behavioral incidents. Plaintiffs allege upon information and belief that T.L. was placed in the seclusion room during some of these "reboot" incidents. Parents were not notified of these behavioral incidents until March 8, 2023. Some of the incidents involved "disrespectful behavior," "not following directions," and "refusal/disrespect," which are *not* grounds for a "reboot" under the operative BIP, and posed no imminent danger of physical injury to anyone.

62.     On February 7, 2023, the District secluded T.L. for ten minutes for allegedly punching a paraprofessional in the stomach. Parents did not receive a report of this incident until March 2023.

63.     On February 10, 2023, the District placed T.L. in the seclusion room two

separate times, for a total of 187 minutes, for allegedly engaging in physically and verbally aggressive behaviors and elopement. Parents did not receive a report of these incidents until March 2023.

64.     Each of the five reported incidents of seclusion during the 2022–2023 school year was preceded by T.L. refusing to work in the classroom. Because the ad hoc interventions used by District personnel in responding to T.L.'s work refusals were ineffective, his behaviors frequently escalated to aggression and elopement. Yet, during the 2022–2023 school year, the District never performed an FBA to determine the functions of T.L.'s work refusals. Nor were any adjustments made to the BIP to effectively manage T.L.'s behaviors, which were obviously interfering with his ability to learn at school. T.L. missed many hours of instruction while he was placed in seclusion or in the "reboot" process.

65.     In all five of the reported incidents of seclusion during the 2022–2023 school year, the District used solitary confinement as a punitive measure. There was never any imminent danger of physical injury to anyone (nor were any injuries actually sustained by any students or staff) and/or less restrictive interventions could have been effectively used to mitigate any imminent danger.

66.     On March 7, 2023, District personnel restrained T.L. multiple times, using techniques that are prohibited under AS 14.33.125(c) and/or the Mandt System.

67.     During the morning of March 7, 2023, Defendant Laura Kelly, a paraprofessional in T.L.'s classroom, applied a jaw hold, placing three fingers into T.L.'s mouth and her thumb under his chin, picked him up from behind, and dropped him to the

floor. When T.L. stood up, Ms. Kelly applied a prohibited wrist lock and dragged T.L. into the seclusion room, pushed him to the floor, and slammed the door shut. Parents have never received a report of this incident, in violation of AS 14.33.125(d).

68.     During an elopement incident later on the same day, defendants David Russell and Angela Snow applied restraints that are prohibited under AS 14.33.125(c) and/or the Mandt system. This incident was captured on video by the District's surveillance cameras. Parents never received a report of this incident, in violation of AS 14.33.125(d).

69.     When T.L. came home from school on March 7, 2023, Parents observed significant injuries on his back, as shown in the photographs below. T.L. also complained that his jaw and left wrist and forearm were hurting.





70.     Initially, Parents were told by Mr. Russell (and only after sending an urgent email requesting a call back) that T.L. had tripped and "fallen" at school and suffered a rug burn injury to his back. However, Parents knew that the deep tissue injuries shown in the above photographs were inconsistent with Mr. Russell's story. Moreover, Parents had not received any notification during the school day that T.L. was involved in any type of "fall" and had sustained an injury. Searching for answers, Parents requested to view the video footage of the incidents.

71.     MSBSD has consistently maintained that T.L. was never restrained on March 7, 2023. Not only is that belied by the video surveillance footage, but T.L.'s Health Summary on ParentVue – the portal used by the District to share a child's current and historical information – shows that T.L. was visited twice by school nurse Nathan Leake that day, immediately following the two incidents in the morning and the afternoon.

72.     On March 10, 2023, Mr. Land met with Robyn Harris, the Executive Director of Student Support Services for the District. It was during this meeting that

Parents received for the first time a copy of the reports for five incidents of seclusion during the 2022–2023 school year. Ms. Harris stated that these seclusion reports were "all of them." However, Parents had observed T.L. in the seclusion room on numerous other occasions when they were called to pick T.L. up from his classroom due to his behaviors. For instance, on one occasion in February 2023, Mr. Land witnessed Mr. Russell physically blocking the door to the seclusion room with T.L. inside. Mr. Land was told that T.L. was in the seclusion room because he had disrespectfully "shaken his fist" at Mr. Russell, a behavior which posed no imminent danger of physical injury to anyone.

73.     On March 21 and 24, 2023, Mr. Land was allowed to view video footage of the March 7th incident. The videos clearly showed that Mr. Russell was lying when he said that T.L. had tripped and fallen at school. Instead, the videos showed that at approximately 12:59 p.m. on March 7, 2023, T.L. exited through the double doors of the school building towards the playground area. Less than a minute later, T.L. turned around and went back inside the school building on his own accord. He was calm and safely inside the building and did not pose an immediate danger to himself or any other person. Nevertheless, Defendant Snow grabbed T.L. by the wrist and began restraining him, which only escalated his behaviors and caused him to attempt to flee.

74.     During the ensuing three minutes, T.L. was repeatedly manhandled and restrained by Mr. Russell, Ms. Snow, and two unidentified female staff members, which resulted in a prohibited floor restraint being applied by Mr. Russell while T. L. was on his back.

75.     After T.L. was brought back up to his feet, Mr. Russell and Ms. Snow

applied an expressly prohibited double-arm restraint technique where they picked him up by his elbows in a locked position and with his shoulders pushed in an upward position due to the leverage applied to the elbows. Mr. Russell and Ms. Snow dragged T.L., with his feet hanging and off the floor, down the entirety of the hallway until they entered T.L.'s classroom and placed him in the seclusion room. Again, no report of either the restraints or the seclusion have ever been provided to Parents.

76. The double-arm technique used by Mr. Russell and Ms. Snow on T.L. is prohibited under the Mandt System because it uses pain to control a subject and creates a high risk of joint hyperextension and/or dislocation. Dragging an individual with their feet leaving the floor is also a prohibited practice under the Mandt System, except in the case of an emergency.

## CLASS ACTION ALLEGATIONS

77. Plaintiffs bring this action on behalf of themselves and on behalf of all persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

78. Plaintiff T.L. seeks to represent a subclass composed of all current MSBSD students with an identified disability (including, but not limited to, students with an IEP or 504 plan) who have been subjected to a "restraint" or "seclusion" by District personnel, as those terms are defined under AS 14.33.125(g). Plaintiff T.L. and the members of this proposed subclass are collectively called the "Student Subclass" in this Complaint.

79. Plaintiffs Shane and Christi Land seek to represent a subclass composed of all parents and legal guardians of current MSBSD students with an identified disability (including, but not limited to, students with an IEP or 504 plan) who were subjected to a

"restraint" or "seclusion" by District personnel, as those terms are defined under AS 14.33.125(g). Plaintiffs Shane and Christi Land and the members of this proposed subclass are collectively called the "Parent Subclass" in this complaint.

80. All requirements of Rule 23(a) are met in this case. Specifically,

a. The Student Subclass and Parent Subclass are both so numerous that joinder of all members is impracticable. The number of individuals in the proposed subclasses is presently unknown and can only be determined through discovery. However, the plaintiffs are informed and believe that there are more than 40 individuals in each subclass.

b. There are questions of law or fact common to the subclasses, including (i) whether MSBSD's disproportionate use of restraint and seclusion on students with disabilities discriminates against the members of the Student Subclass; (ii) whether MSBSD's disproportionate use of restraint and seclusion excluded the members of the Student Subclass from participation in or denied them the benefits of the District's services, programs, or activities by reason of their disabilities; (iii) whether MSBSD denied the members of the Student Subclass an equal opportunity to participate in and benefit from MSBSD's education program; (iv) whether MSBSD failed to provide the members of the Student Subclass with reasonable modifications that would obviate or reduce the need for restraint and seclusion; (iv) whether MSBSD unnecessarily segregated the members of the Student Subclass, depriving them of the most integrated setting appropriate; and (v) whether MSBSD has a pattern and practice of violating AS 14.33.120(b) and

AS 14.33.125(d) by failing to provide the members of the Parent Subclass with a written report on the same day as each incident of a restraint or seclusion.

c. The claims of the representative plaintiffs are typical of those of the class.

d. The representative plaintiffs will fairly and adequately represent the class. Neither the representative plaintiffs nor undersigned counsel have interests which might cause them not to vigorously pursue this action.

81. Certification of a class under Federal Rule of Civil Procedure 23(b)(2) is appropriate because MSBSD has acted or refused to act on grounds that apply generally to each subclass, so that final injunctive relief or corresponding declaratory relief is appropriate respecting each subclass as a whole.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR INJUNCTIVE RELIEF ON BEHALF OF STUDENT SUBCLASS AGAINST MSBSD – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**

82. Plaintiffs repeat and incorporate by reference the allegations in each of the preceding paragraphs.

83. Under Section 504 of the Rehabilitation Act, a "qualified individual with a disability" may not, solely by reason of disability, be subjected to discrimination, excluded from participation in, or denied the benefits of any "program or activity" that receives federal financial assistance. 29 U.S.C. § 794(a).

84. Plaintiff T.L. and each member of the Student Subclass is a "qualified individual with a disability" under Section 504 and its implementing regulations, because

they have a condition that substantially limits one or more major life activities.

85.     Under Section 504, a "program or activity" is defined to include a local educational agency. 29 U.S.C. § 794(b)(2)(B).

86.     MSBSD is a local educational agency that receives federal financial assistance.

87.     The regulations implementing Section 504 require a public elementary or secondary education program or activity to provide a "free appropriate public education" to each qualified individual with a disability within its jurisdiction, regardless of the nature or severity of the person's disability. 34 C.F.R. § 104.33(a). An "appropriate" education requires the provision of regular or special education and related aids and services that are designed to meet a disabled student's needs as adequately as the needs of non-disabled students. 34 C.F.R. § 104.33(b)(1).

88.     In a December 28, 2016 *Dear Colleague Letter*, OCR issued guidance to school districts on how the use of restraint and seclusion may result in discrimination against students with disabilities, in violation of Section 504. *See* U.S. Dep't of Ed. Off. for Civ. Rights, *Dear Colleague Letter: Restraint and Seclusion of Students with Disabilities* at 1-2 (Dec. 28, 2016), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-504-restraint-seclusion-ps.pdf. OCR's guidance stated that "[a]school district discriminates on the basis of disability in its use of restraint or seclusion by (1) unnecessarily treating students with disabilities differently from students without disabilities; (2) implementing policies, practices, procedures, or criteria that have an effect of discriminating against students on

the basis of disability or defeating or substantially impairing accomplishment of the objectives of the school district's program or activity with respect to students with disabilities; or (3) denying the right to a free appropriate public education (FAPE)." *Id.* at 3. OCR also explained that the repeated use of restraint and seclusion on a student is not justified "where alternative methods also could prevent imminent danger to self or others." *Id.* at 9.

89.     MSBSD has systemically violated Section 504 by disproportionately and improperly using restraint and seclusion as a disciplinary measure against the members of the Student Subclass, thereby excluding the students from participation and denying the benefits of a public school education.

90.     MSBSD's disproportionate and unjustified use of restraint and seclusion as a disciplinary measure, instead of providing reasonable accommodations like PBIS, denied the members of the Student Subclass a "free appropriate public education" under Section 504 because it denied the students the services and supports that are designed to meet their needs as adequately as the needs of non-disabled students.

91.     MSBSD's disproportionate and improper use of restraint and seclusion on the members of the Student Subclass discriminates against students with disabilities, excludes them from participation in, and denies them the benefits of MSBSD's education program, in violation of Section 504.

**SECOND CLAIM FOR INJUNCTIVE RELIEF ON BEHALF OF STUDENT SUBCLASS AGAINST MSBSD – VIOLATION OF TITLE II OF AMERICANS WITH DISABILITIES ACT**

92.     Plaintiffs repeat and incorporate by reference the allegations in each of the

preceding paragraphs.

93.     Title II of the ADA applies to all services, programs, and activities of public entities, including public educational institutions. *See* 42 U.S.C. § 12131 *et seq.*

94.     During all relevant times, MSBSD has been a public entity covered by Title II of the ADA.

95.     Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

96.     Title II of the ADA prohibits a public entity from utilizing methods of administration that "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3)(i).

97.     Title II of the ADA also prohibits a public entity from providing disabled individuals "with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii).

98.     Title II of the ADA requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

99.     Title II of the ADA also requires a public entity to "administer services,

programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

100. Plaintiff T.L. and each member of the Student Subclass is a "qualified individual with a disability" within the meaning of the ADA.

101. MSBSD's disproportionate and improper use of restraint and seclusion as a disciplinary measure against the members of the Student Subclass violates Title II of the ADA in that it denies the students an equal opportunity to participate in and enjoy the benefits of the District's services, programs, and activities by reason of their disabilities.

102. MSBSD failed to provide the members of the Student Subclass with reasonable modifications, such as PBIS, to avoid discrimination in the use of restraint and seclusion on students with disabilities. Most, if not all, of the incidents of restraint and seclusion during the relevant time period could have been avoided if MSBSD had provided the members of the Student Subclass with reasonable modifications.

103. MSBSD's disproportionate and improper use of restraint and seclusion as a disciplinary measure against the members of the Student Subclass denied students with identified disabilities an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided by the District to non-disabled students.

104. MSBSD's overuse of restraint and seclusion on members of the Student Subclass violates Title II of the ADA because it segregates students with disabilities from their classrooms and peers and fails to serve the students in the most integrated setting appropriate to their needs.

**THIRD CLAIM FOR INJUNCTIVE RELIEF ON BEHALF OF PARENT
SUBCLASS AGAINST MSBSD – VIOLATION OF AS 14.33.125(d)**

105.    Plaintiffs repeat and incorporate by reference the allegations in each of the preceding paragraphs.

106.    MSBSD has a pattern and practice of failing to provide parents and legal guardians with a timely written report of each incident of a restraint or seclusion as required by AS 14.33.125(d).

107.    For example, in a letter dated May 11, 2023, the MSBSD's Superintendent, Randy Trani, admitted that Parents did not receive a written report of T.L.'s seclusion incidents during the 2022–2023 school year "within a reasonable time period." Furthermore, Parents still have not received a written report regarding the restraints and seclusions applied on T.L. on March 7, 2023.

108.    Plaintiffs allege upon information and belief that MSBSD has failed to provide numerous other parents and legal guardians with a timely written report following the restraint or seclusion of their child by District personnel. Many incidents of restraint and seclusion are not reported at all to a child's parents. When a report is provided, it is often sent long after the incident.

**FOURTH CLAIM FOR DAMAGES ON BEHALF OF T.L.
INDIVIDUALLY AGAINST ALL DEFENDANTS – VIOLATION OF 42 U.S.C. §
1983**

109.    Plaintiffs repeat and incorporate by reference the allegations in each of the preceding paragraphs.

110.    The Fourth Amendment to the United States Constitution protects

individuals against unreasonable seizures of their person. A seizure violates the Fourth Amendment if it is objectively unreasonable under the circumstances. *See, e.g., Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003).

111. The Fourth Amendment applies to students in the school environment. The excessive use of force by a public school official against a student constitutes an unreasonable seizure in violation of the Fourth Amendment. *See, e.g., Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1180 (9th Cir. 2007).

112. The Individual Defendants are "persons" subject to liability under 42 U.S.C. § 1983.

113. The Individual Defendants, while acting under color of state law and within the course and scope of their employment with MSBSD, used excessive force against plaintiff T.L. that was objectively unreasonable under the circumstances because (i) T.L.'s behavior did not pose an imminent danger of physical injury to anyone; (ii) less restrictive interventions would have been effective in mitigating any imminent danger posed by T.L.'s behavior; (iii) the Individual Defendants continued to restrain T.L. even after any danger of physical injury had ended; (iv) the restraints applied by the Individual Defendants substantially departed from accepted standards; and (v) the restraints applied by the Individual Defendants were painful and created a substantial risk of injury.

114. MSBSD is liable under 42 U.S.C. § 1983 because the unwritten customs and practices of the District and a District-wide failure to train its employees caused the Individual Defendants to violate T.L.'s Constitutional right to be free from unreasonable seizures.

115.    The data reported by MSBSD to DEED shows that the District does not use restraint and seclusion in *rare* circumstances where a student's behavior poses imminent danger of serious physical harm to the student or others. Rather, MSBSD frequently uses these techniques to address noncompliant student behavior in the absence of any safety threat, and in response to misbehavior that the District should have anticipated and managed as part of educating students with emotional and behavioral needs.

116.    MSBSD inadequately trains its employees on how to appropriately respond to the behavioral manifestations of students with disabilities and the use of appropriate crisis intervention, de-escalation, and restraint techniques. MSBSD's inadequate training program actually caused the deprivation of T.L.'s Constitutional rights by the Individual Defendants.

117.    MSBSD is deliberately indifferent to the inadequate training of its employees. Based on the data reported to DEED, and the data contained in the written reports prepared in accordance with AS 14.33.125(d), MSBSD has actual or constructive notice that its inadequate training program is causing its employees to violate students' Constitutional rights.

118.    As a direct and proximate result of the defendants' violation of his Constitutional rights, Plaintiff T.L. suffered physical injury, emotional distress, mental anguish and suffering, and humiliation.

**FIFTH CLAIM FOR DAMAGES ON BEHALF OF T.L. INDIVIDUALLY AGAINST ALL DEFENDANTS – VIOLATION OF AS 14.33.125**

119.    Plaintiffs repeat and incorporate by reference the allegations in each of the

preceding paragraphs.

120.    Defendants violated AS 14.33.125 by repeatedly restraining and secluding Plaintiff T.L. when (i) his behavior did not pose an imminent danger of physical injury to anyone; (ii) less restrictive interventions would have been effective in mitigating any imminent danger posed by T.L.'s behavior; (iii) the Individual Defendants continued to restrain and seclude T.L. even after any danger of physical injury had ended; (iv) the Individual Defendants restrained T.L. on his back; and (v) the Individual Defendants restrained T.L. using prohibited techniques under the Mandt System.

121.    By using techniques that are not authorized under MSBSD's approved school disciplinary and safety program, or because their acts and omissions constitute gross negligence or intentional misconduct, the defendants are liable for civil damages resulting from their professional misconduct and gross deviation from standards of care.

### SIXTH CLAIM FOR DAMAGES ON BEHALF OF T.L. INDIVIDUALLY AGAINST ALL DEFENDANTS – NEGLIGENCE

122.    Plaintiffs repeat and incorporate by reference the allegations in each of the preceding paragraphs.

123.    Defendants owed Plaintiff T.L. a duty of care to adequately supervise him at school and to keep him safe from danger and abuse while on school grounds.

124.    Alaska Statute 14.33.125 defines the standard of care for school personnel when restraining or secluding a student.

125.    The Individual Defendants were negligent per se by restraining and secluding plaintiff T.L. in violation of the standard of care established under AS

14.33.125.

126. Alternatively, the Individual Defendants failed to exercise reasonable care when restraining and secluding plaintiff T.L.

1267. The Individual Defendants' negligent acts were a substantial factor in causing harm to plaintiff T.L., including physical injury, emotional distress, mental anguish and suffering, and humiliation.

### SEVENTH CLAIM FOR DAMAGES ON BEHALF OF T.L. INDIVIDUALLY AGAINST ALL DEFENDANTS – BATTERY

128. Plaintiffs repeat and incorporate by reference the allegations in each of the preceding paragraphs.

129. The Individual Defendants acted with the intent to touch Plaintiff T.L. in a harmful or offensive way.

130. The Individual Defendants' actions resulted in a harmful or offensive touching of Plaintiff T.L.

131. Plaintiff T.L. did not consent or cause the Individual Defendants to reasonably believe that he consented to the harmful or offensive touching of his body.

132. As a direct and proximate result of the Individual Defendants' actions, Plaintiff T.L. suffered physical injury, emotional distress, mental anguish and suffering, and humiliation.

133. The Individual Defendants' conduct was committed within the course and scope of their employment with MSBSD.

**WHEREFORE,** the plaintiffs pray for the following relief:

(1)     Certification of the above-defined subclasses;

(2)     A declaration and finding that MSBSD's disproportionate and unjustified use of restraint and seclusion on students with disabilities discriminated against the Student Subclass in violation of Section 504 and Title II of the ADA by (i) excluding them from participation in or denied them the benefits of the District's services, programs, or activities by reason of their disabilities; (ii) denying them an equal opportunity to participate in and benefit from MSBSD's education program; (iii) failing to provide reasonable modifications that would obviate or reduce the need for restraint and seclusion; and (iv) unnecessarily segregating the members of the Student Subclass, depriving them of the most integrated setting appropriate;

(3)     A declaration and finding that MSBSD has a pattern and practice of violating AS 14.33.120(b) and AS 14.33.125(d) by failing to provide the members of the Parent Subclass with a written report on the same day as each incident of a restraint or seclusion;

(4)     A declaration and finding that the Individual Defendants unreasonably seized plaintiff T.L., in violation of the Fourth Amendment to the United States Constitution by applying excessive force and using restraint techniques that substantially departed from accepted standards;

(5)     An injunction requiring the immediate closure of all seclusion rooms in MSBSD and prohibiting the District and its employees from secluding students for any reason;

(6)    An injunction prohibiting MSBSD and its employees from applying a physical restraint unless a student's behavior poses an imminent danger of *serious* physical injury to the student or others;

(7)    An injunction prohibiting MSBSD and its employees from applying a physical restraint as a form of discipline or punishment; to force compliance with staff directions to a student; as a convenience to staff; or to move a student from one location to another, unless the failure to move that student or to prevent that student from leaving the classroom or other physical space will create an imminent danger of serious physical injury to that student or another person;

(8)    An injunction prohibiting MSBSD and its employees from applying a physical restraint while placing students on their back or stomach; in a manner that restricts breathing; using any technique that is prohibited under the Mandt System; or continuing to apply a restraint after the student's behavior no longer poses an imminent danger of *serious* physical injury to the student or another person;

(9)    An injunction requiring MSBSD to provide a student's parents or legal guardians with a written notice containing the information required under AS 14.33.125(d) on the same day as any incident of a restraint;

(10)    An injunction requiring MSBSD to convene a disabled student's 504 or IEP team within seven days of any restraint to determine whether any additional evaluations are necessary and whether to make any changes to the student's IEP, BIP, or 504 plan;

(11)    An injunction requiring MSBSD to regularly train all staff who have regular contact with students on the Mandt System or another evidence-based crisis intervention

training program selected by the District's governing body, with required annual certification and quarterly refresher training as recommended by the Mandt Training Curriculum;

(12)  A judgment against each of the defendants, jointly and severally, awarding plaintiff T.L. nominal damages;

(13)  A judgment against each of the defendants, jointly and severally, awarding plaintiff T.L. compensatory damages according to proof;

(14)  An award of reasonable attorney's fees and costs to the plaintiffs pursuant to 42 U.S.C. § 1988 or other applicable laws;

(15)  For such other and further equitable relief as this Court may deem just under the circumstances; and

(16)  All other proper relief.

DATED this 4th day of December, 2023.

NORTHERN JUSTICE PROJECT, LLC
Attorneys for Plaintiffs


By: /s/ Goriune Dudukgian
Goriune Dudukgian, ABA No. 0506051
Nicholas Feronti, AK Bar No. 2106069
Aneliese Palmer, AK Bar No. 2201001